ANTHONY COMPARATO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MILDRED COMPARATO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Comparato v. Commissioner
Docket Nos. 11554-89, 11750-89
United States Tax Court
T.C. Memo 1993-52; 1993 Tax Ct. Memo LEXIS 53; 65 T.C.M. (CCH) 1890; February 16, 1993, Filed *53 Decisions will be entered under Rule 155. For Petitioners: Richard F. Thurston. For Respondent: Rosemarie Dever Camacho. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the taxable years 1981 through 1984 as follows: 1. Anthony Comparato, Docket No. 11554-89
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1]6653(b)(1) 6653(b)(2)
6654(a)
6661(a)
1981
$ 2,295.00
$ 1,147.50
--
$ 175.85
--   1982
18,048.50
14,953.75
[2] --  $ 4,512.13
1983
17,214.00
12,708.50
[2] --  4,303.50
1984
102,069.51
51,372.26
[2] --  25,517.38
2. Mildred Comparato, Docket No. 11750-89
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1]6653(b)(1) 6653(b)(2)
6654(a)
6661(a)
1981
$ 2,295.00
$ 1,147.50
--
$ 175.85
--     1982
9,036.00
4,518.00
[2] 877.73
$ 2,259.00
1983
8,480.00
4,240.00
[2] 519.49
2,120.00
1984
100,974.80
50,487.40
[2] 6,357.83
25,243.70
*54 As an alternative to the additions to tax for fraud under section 6653(b), [1] respondent determined that each petitioner was liable for additions to tax under sections 6651(a)(1) (failure to file) and 6653(a)(1) and (2) (negligence). Although respondent also determined that each petitioner was liable for tax on the total taxable income petitioners failed to report for the years at issue, the parties have agreed that each petitioner is responsible for tax on one-half, rather than all, such income. *55 As a result, the parties have agreed to reduced deficiencies for both petitioners, and any additions to tax for fraud, negligence, failure to file, and failure to pay estimated tax for the years in question must correspondingly be reduced. Respondent has conceded all additions under section 6661(a) for substantial understatement of income tax. [2]
We granted respondent's motion to consolidate these cases for trial, briefing, and opinion. After the concessions, the issues for decision are whether petitioners are liable for additions *56 to tax for fraud or, in the alternative, for negligence or intentional disregard of rules or regulations and for failure to file Federal income tax returns, and also whether petitioners are liable for additions to tax for underpayments of estimated tax. For the reasons that follow, we hold (1) that petitioners are not liable for additions to tax for fraud for any of the years in question, but (2) that they are liable for additions to tax for failing to file returns and for negligence for all such years. We hold further (3) that petitioners are liable for additions to tax for failing to pay estimated tax for all such years. FINDINGS OF FACT Some of the facts in this case have been stipulated and we incorporate them and their attached exhibits by this reference. Because respondent asserts that petitioners' prior tax history bears on their liability for fraud additions for the years at issue, our findings include that prior history, as well as the facts that directly pertain to the years at issue. Our findings on the prior history are based on the facts and exhibits deemed stipulated and admitted in petitioners' prior case before this Court, [3] their stipulations in the case at *57 hand, and petitioners' trial testimony and an additional joint exhibit introduced at trial. Petitioners are husband and wife who resided in Queens, New York, when they filed their petitions. They are cash basis taxpayers. All items bearing on petitioners' income tax liabilities for the years at issue are to be allocated one-half to each of them. Prior History
Anthony Comparato was born in the United States, but his parents had emigrated to the United States from Sicily. He grew up in East Harlem in New York City and did not learn to speak English until he "went out into the street". Mr. Comparato has had no formal training in accounting, business, or taxation. After graduating from high school prior to World War II, Mr. Comparato delivered newspapers and was an apprentice machinist. At age 20, Mr. Comparato joined the U.S. Army Air Corps; he was trained and worked as an electrical specialist, and attained the rank of private *58 first class. After the war, Mr. Comparato returned to his job as a machinist. He soon left that job and became a U.S. Post Office clerk. After Mr. and Mrs. Comparato were married in 1951, he took a second job as a truck driver picking up foreign and other out-of-town newspapers at Kennedy International Airport and dropping them off at newsstands throughout Manhattan. Mr. Comparato eventually resigned from the Post Office and worked full-time as a truck driver. Mr. Comparato later founded Murray Hill Newspaper Distributors, Ltd. (Murray Hill), to engage in the distribution of foreign and out-of-town newspapers, and operated Murray Hill with Mrs. Comparato from the early 1960s through the mid-1970s. Murray Hill elected early on to have its income and other items treated under the subchapter S regime. As Murray Hill's president, Mr. Comparato managed its day-to-day operations. He answered telephones, coordinated pick-ups at Kennedy Airport and deliveries throughout Manhattan, dispatched drivers, sorted freight, kept the books, paid bills, and signed Federal income tax returns. Murray Hill had four to six other employees who worked as drivers and freight handlers. Mrs. Comparato *59 never graduated from high school. After undergoing surgery in her junior year, she suffered a nervous breakdown and did not return to school. Before she was married, Mrs. Comparato was employed as a receptionist and file clerk, but emotional problems caused her to have an erratic employment history. After marrying Mr. Comparato, she worked for Murray Hill without pay as its secretary and treasurer, in addition to keeping house and caring for petitioners' four children. The youngest child was a quadriplegic, who suffered the second of two strokes at age 6 in 1971, was kept at home but required constant care and medical attention, and died in 1984 at age 19. Mrs. Comparato's business duties at Murray Hill were originally limited to general office work and bookkeeping. However, her duties escalated during the 3-year period after her son's second stroke in 1971 because Mr. Comparato was incapacitated by heavy drinking. Mrs. Comparato worked 14-hour days and performed almost all the managerial and clerical tasks required to run the business that had been performed by Mr. Comparato. During this later period, Mrs. Comparato also signed Federal corporate income tax returns prepared *60 by Murray Hill's accountant. Petitioners operated Murray Hill successfully for a number of years, but it suffered a decline in business in the early 1970s due, at least in part, to economic and labor problems in the newspaper industry. In 1974, Murray Hill changed its business to general trucking. During the early 1970s, on the advice of its tax accountant, but for reasons not disclosed by the record, Murray Hill elected to change its tax status from S corporation to C corporation. This change resulted in two levels of income taxation: one at the corporate level and the other at the shareholder level. Murray Hill thereby became separately liable for Federal income taxes, rather than being able to pass through its subchapter S items. After examining Murray Hill's tax returns for the years 1974, 1975, and 1976, the Commissioner determined that Murray Hill had made constructive dividend distributions to petitioners, that Murray Hill had not paid taxes on its income, that petitioners had caused Murray Hill to claim deductions for their personal expenses, and that petitioners had filed fraudulent corporate income tax returns. During the IRS investigation, petitioners believed that *61 the IRS was trying to "close [them] down" and that the IRS told Murray Hill's customers not to continue dealing with them. During this period (and possibly thereafter), petitioners borrowed money from lenders who charged usurious rates of interest. For the years 1974, 1975, and 1976, Mr. Comparato filed Federal income tax returns as a married taxpayer filing separately, but Mrs. Comparato did not file income tax returns. On April 13, 1982, petitioners were indicted for attempting to evade part of Murray Hill's corporate income tax liabilities for 1974, 1975, and 1976; for signing (Mrs. Comparato), aiding and abetting in the preparation of (Mr. Comparato), and filing fraudulent corporate income tax returns for those years, and of attempting to evade the personal income tax liabilities of Mr. Comparato for the years 1974, 1975, and 1976. On July 28, 1982, Mr. Comparato was convicted on 7 of 9 counts on which he had been charged, including wilfully filing a false and fraudulent income tax return under section 7201 for 1976, a return that he appears to have prepared without the assistance or participation of a tax return preparer. On September 24, 1982, he was sentenced to serve *62 a 3-month jail term, placed on probation for 33 months, and ordered to perform 4 hours a week of community service during the probation period. Mr. Comparato served his time and was released before the end of 1982. Mrs. Comparato was convicted on all counts on which she had been charged and placed on 3 years' unsupervised probation. In September 1986, respondent determined that petitioners were liable for substantial deficiencies in Federal income tax and additions to tax for fraud under section 6653(b) for the years 1974-76. Petitioners sought redeterminations in this Court by means of pro se petitions. Petitioners did not cooperate in the pretrial discovery process, and did not respond adequately to respondent's interrogatories, document requests, and requests for admissions. Early in December 1987, an attorney filed a notice of appearance on behalf of Mr. Comparato, but neither he nor petitioners were ready for trial at the Court's regular trial session in Westbury, New York, on December 7, 1987. At the calendar call for the Court's New York City February 29, 1988, trial session, to which their cases had been continued (petitioners' attorneys' requests for a longer continuance *63 having been denied), the cases were set down for trial on March 7, 1988. The Court granted respondent's motions to deem admitted under Rules 90(g) and 91(f) the matters set forth in respondent's proposed stipulations of facts and requests for admissions, [4] and rejected Mrs. Comparato's offer of proof to testify on her own behalf. The Court also denied another continuance to Mr. Comparato, who was not present in the courtroom by reason of an alleged illness. As a result, petitioners did not testify or present any evidence at trial. Neither petitioners nor their attorney filed a brief. On November 27, 1989, [5] the Court held for the Commissioner for all 3 years on the basis of petitioners' deemed admissions and stipulations of fact. [6] However, the Court did find that petitioners' deemed admissions and stipulations, to the effect *64 that each of them had received Murray Hill's entire deemed dividend distributions were obviously erroneous, and therefore held that each petitioner was liable for tax on one-half, rather than all, the constructive dividends. Inasmuch as Mr. Comparato had been convicted of filing a fraudulent return for 1976, the Court held that he was estopped from denying that the return was fraudulent. Moreover, for all years at issue, the Court found that the facts deemed admitted and stipulated established substantial omissions of income, and contained indicia of fraud that satisfied respondent's burden of proving that some part of petitioners' understatements were due to fraud. On December 27, 1989, petitioners, through another attorney who has also represented them in the current proceeding, [7] filed a motion for reconsideration, which we denied on January 22, 1990. Following entry of decision, petitioners, through this same attorney, filed motions to vacate on the ground that the substantial medical expenses for their son during the years in question had not been taken into account. The Court denied those motions. In June 1990, petitioners filed an appeal with the U.S. Court of Appeals *65 for the Second Circuit, which was dismissed by stipulation. Years in Issue
In 1976, petitioners purchased 617 shares of capital stock in the York Towers cooperative apartment corporation (the cooperative), located at 501 East 79th Street in Manhattan, for $ 30,000. [8] These shares, which related to Apartment 16A and a room and bath of Apartment 16B (the apartment), are deemed (by stipulation) to have been owned in equal amounts by petitioners. Petitioners lived in the apartment for several years after the purchase. *66 They made substantial improvements, including installation of a new kitchen and major appliances, new windows, and complete restoration of a bathroom. Petitioners borrowed $ 50,000 from a bank and used part of the proceeds of the loan to make these improvements. Petitioners paid cash to some of the contractors who performed the work, and did not keep records of any of their payments to contractors. On January 6, 1982, Mrs. Comparato, with help from attorney Harry Morgenstern, agreed to let the apartment for 2 years to Dr. Vartan Gregorian, President of the New York Public Library (the Library). The lease provided that Dr. Gregorian was to pay monthly rent of $ 4,500, less the monthly maintenance charges, which he was to pay directly to the cooperative. The lease also provided that Dr. Gregorian was to pay "all utilities including gas, electric and telephone, cable television charges, repairs and any personal expenses *67 in connection with his use and occupation" of the apartment. The maintenance charges were approximately $ 1,285 per month, and were adjusted from time to time by the cooperative. Dr. Gregorian's rent was actually paid by the Library. In late December 1981, prior to the execution of the lease the following January, petitioners received from the Library two checks dated November 24, 1981, totaling $ 13,500. This $ 13,500 advance payment included a $ 9,000 security deposit (to be applied to the last 2 months' rent) and a $ 4,500 rent payment for January 1982. The $ 9,000 security deposit was not held in escrow, but deposited directly into petitioners' bank account. From March 3, 1982, through May 28, 1982, Mr. Morgenstern collected rental payments on behalf of petitioners. On June 28, 1982, after petitioners had been indicted but prior to their criminal trial, Mrs. Comparato instructed Dr. Gregorian and the Library to pay all future rent checks to her directly rather than to Mr. Morgenstern. Mrs. Comparato usually picked up these checks and cashed them rather than depositing them in petitioners' bank account. Although Mr. Comparato perceived himself as being in charge of the *68 family's financial and tax affairs, he decided, for the sake of convenience, that Mrs. Comparato should receive all the rent checks because he expected to go to jail if he was convicted in the pending criminal case. Despite these arrangements, Mrs. Comparato believed that the income from the rental payments belonged to Mr. Comparato as head of the household. During 1982, petitioners received total taxable rental income from the Library as follows: Date
Amount
March 3, 1982
$2,375.82 March 16, 1982
1,909.90
May 6, 1982
3,214.59
May 28, 1982
3,214.59
June 30, 1982
3,214.59
July 29, 1982
2,597.59
August 30, 1982
2,906.09
September 27, 1982
2,906.09
October 18, 1982
2,906.09
November 29, 1982
2,909.09
December 28, 1982
3,214.59
Total for 1982
$ 31,369.03
During 1983, petitioners received total taxable rental income from the Library as follows: Date
Amount
February 1, 1983
$ 3,214.59 February 16, 1983
3,214.59
March 23, 1983
3,214.59
April 28, 1983
3,214.59
May 25, 1983
3,214.59
July 1, 1983
3,214.59
August 1, 1983
3,214.59
August 17, 1983
3,214.59
September 28, 1983
3,150.31
October 28, 1983
3,150.31
Total for 1983
$ 32,017.34
In stipulating *69 these amounts, the parties used the net amounts petitioners actually received from the Library, [9] after deducting the monthly maintenance charges, paid directly by the Library to the cooperative, and reimbursements for electricity charges. [10]
*70 On February 9, 1984, petitioners sold their shares in the cooperative for $ 550,000. [11] *71 Because petitioners had failed to keep records of their expenditures in renovating the apartment, the only basis in the cooperative shares at the time of sale that they could substantiate to respondent's satisfaction was $ 30,000, their original cost, without any increase for the improvements or reduction for depreciation allowed or allowable while the apartment was income-producing property. [12] In addition, petitioners have not been allowed any deductions for interest payments on the bank loan that was outstanding during the years in issue, nor any deductions for medical expenses for their son's care. The parties have stipulated that petitioners had $ 520,000 in long-term capital gain from the sale of the shares and that petitioners' aggregate net gain for the taxable year 1984, after taking into account the deduction provided by section 1202, [13] was $ 206,800. Mr. Comparato used the proceeds of the sale of the cooperative shares to pay the $ 50,000 bank loan and also paid approximately $ 30,000 to the Internal Revenue Service (IRS), which had a lien on the shares arising from a previous income tax controversy. Mr. Comparato also paid remaining debts (in some undisclosed amount) to usurious lenders. Petitioners did not hire *72 anyone to prepare their income tax returns for the years in issue. Their experiences with the actions and advice of Murray Hill's tax accountant, who had failed or refused to explain to the IRS or testify at their criminal trial concerning his role in causing their prior tax problems, had left them with an aversion to dealing with tax accountants and tax advisers. Mr. Comparato feared that if he had anything more to do with tax professionals he would get into more trouble with the IRS. Mr. Comparato has never filed a Federal income tax return for 1981, 1982, 1983, or 1984. Mr. Comparato did not file a Federal income tax return for 1981 because he did not believe he was required to do so. He thought the $ 13,500 received in December 1981 was 1982 income rather than 1981 income because it was a prepayment of the January 1982 rent and security deposit. The fears induced by petitioners' prior unpleasant experiences with the tax system appear to have blocked Mr. Comparato from filing returns for the later years until after the IRS began to audit petitioners' tax liabilities for taxable years subsequent to 1976. Mrs. Comparato has never filed Federal income tax returns for the taxable *73 years 1981-1984, just as she never filed returns for 1974, 1975, or 1976. Mrs. Comparato thought that filing personal tax returns was her husband's job, inasmuch as he was the "man of the house", and that the family income was her husband's income because he was "the head of the household." Even though her name appeared as lessor on the lease with Dr. Gregorian, and she received rent checks drawn to her order, she thought the rental income belonged to Mr. Comparato, just as she considered that she had been working without pay when she had been managing Murray Hill while he had been indisposed. Similarly, Mrs. Comparato believed that the proceeds from the sale of the cooperative shares belonged to Mr. Comparato. On March 10, 1986, more than 1 year after the IRS began auditing petitioners' income tax liabilities for the years at issue, Mr. Comparato filed Federal income tax return forms for himself for the years 1982, 1983, 1984 and 1985, using the abbreviated Form 1040A. Mr. Comparato had not obtained an extension of time to file for any of these years. The only items of information contained on the tax return forms filed by Mr. Comparato were his name, address, Social Security *74 number, a dollar amount of income on the line for wages, salaries, tips, etc., which he described as "various", and his signature. Mr. Comparato did not select any filing status, such as married filing jointly or separately, and did not claim any personal or dependency exemptions. [14] Neither Mrs. Comparato's name nor her signature appeared on the return forms. Mr. Comparato arrived at the amounts he reported through "guesswork" and estimated the net rental income to be $ 3,500 per month, which is somewhat more than the taxable income the parties stipulated petitioners received each month during the 2-year period they received rental income. Mr. Comparato did not specifically report the income as rental income, did not compute the tax, and paid no tax with the return forms. Mr. Comparato did not report any proceeds or gain for 1984 on the sale of the York Towers cooperative shares. *75 On the 1985 tax return form, Mr. Comparato reported income of $ 2,100, again described as "various", "plus" $ 550,000, representing the gross proceeds of the sale of the cooperative shares. The form as filed did not claim any basis for the shares and did not compute the section 1202 deduction or the net long-term capital gain. [15]
In addition to the income described above, petitioners received interest income on two bank accounts in the aggregate amount of $ 1,863.13 in 1984. These amounts also were not itemized on any of the tax return forms filed by Mr. Comparato. Mr. Comparato filed the return forms when and as he did in the hope the IRS would calculate his tax liabilities on the basis of the information he had provided, plus information available *76 to the IRS regarding deductions that was not easily available to petitioners because they had not maintained any records to substantiate them. There is no evidence in the record that Mr. Comparato did not try to cooperate with the IRS in the audit of petitioners' income tax liabilities for the years in issue. There is no evidence in the record, other than a reference by respondent's counsel at trial to a revenue agent's report, [16] concerning whether petitioners filed returns or have paid any income tax for the intervening years 1977-1980. Petitioners failed to keep adequate books and records of the lease and sale of the apartment from 1981 through 1984. They kept no records of the rents received or the costs of renovating the apartment. Petitioners failed to make any estimated tax payments for the years in issue. ULTIMATE FINDINGS OF FACT Respondent has not proved by clear and convincing evidence that some part of petitioners' *77 underpayments of tax for any of the years in question was attributable to fraud. Petitioners have not proved by a preponderance of the evidence that their failures to file income tax returns and their underpayments of tax for any of the years in question were due to reasonable cause and not due to willful neglect. OPINION Issue 1. Fraud
Section 6653(b)(1) imposes an addition to tax of 50 percent of the underpayment of tax required to be shown on the return if any part of the underpayment is due to fraud. Section 6653(b)(2) imposes an addition of 50 percent of the interest payable under section 6601 on the part of the underpayment due to fraud from the last day for payment of the underpayment until the earlier of the date of the assessment or payment of the underpayment. When respondent seeks to impose the addition to tax for fraud under section 6653(b), respondent bears the burden of proving by clear and convincing evidence that petitioners have an underpayment for the taxable year, and that some part of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b); Stone v. Commissioner, 56 T.C. 213, 220-221 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). *78 This standard was vividly explained by the Board of Tax Appeals in Gano v. Commissioner, 19 B.T.A. 518, 532-533 (1930), which, in the course of approving the fraud addition for 2 years, and rejecting it for 2 other years, stated that: in assaying evidence to determine the presence or absence of fraud, the scales of justice must dip more heavily than in the ordinary civil case -- a mere preponderance is not enough, the evidence of fraud must be clear and convincing.
In Cirillo v. Commissioner, 314 F.2d 478 (3d Cir. 1963), affg. in part and revg. in part T.C. Memo. 1961-192, the Third Circuit stated: the evidence must be evaluated in the light of the settled rule that fraud can be established only by clear and convincing proof or, as we have put it, "by something impressively more than a slight preponderance of evidence". Valetti v. Commissioner, 3d Cir., 1958, 260 F.2d 185, 188. Accord, Goldberg v. Commissioner, 5th Cir., 1956, 239 F.2d 316. To justify a fraud penalty the circumstances surrounding the failure to file returns *79 must strongly and unequivocally indicate an intention to avoid the payment of taxes. Powell v. Granquist, 9th Cir., 1958, 252 F.2d 56, cf. Bender v. Commissioner, 7th Cir., 1958, 256 F.2d 771.
Petitioners have stipulated that they have underpaid their income tax for all years in issue. Thus, for each such year, respondent has satisfied the first element of fraud, an underpayment. However, petitioners argue, despite their failures to file income tax returns and to keep records, that they are not liable for the fraud addition because they lacked the second element of fraudulent intent. Fraudulent intent is established by proving that the taxpayer had the specific intent to evade a tax believed to be owing, by conduct intended to conceal, mislead, or otherwise prevent its collection. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956). *80 The existence of fraud is a purely factual question. Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). Fraud is never presumed; even if the taxpayer's testimony is not credible in all respects, we may still be left with no more than a suspicion of fraud. Rinehart v. Commissioner, T.C. Memo. 1983-184. [17] We will not sustain respondent's finding of fraud when we are only left with a suspicion of fraud, Green v. Commissioner, 66 T.C. 538, 550 (1976), and even a strong suspicion does not suffice. See Axelrod v. Commissioner, T.C. Memo. 1982-92. Fraud may be proven by circumstantial evidence because direct proof of the taxpayer's state of mind is rarely available. Rowlee v. Commissioner, supra.We examine the taxpayer's entire course of conduct to determine whether respondent *81 has established fraudulent intent. Miller v. Commissioner, 94 T.C. 316, 333 (1990); Recklitis v. Commissioner, 91 T.C. 874, 909-910 (1988). Weighing and evaluating the objective evidence and the taxpayer's testimony in a fraud case can be a difficult task. As the U.S. Court of Appeals for the District of Columbia Circuit said in Stone v. Commissioner, 865 F.2d 342, 344 (D.C. Cir. 1989), revg. and remanding Rosenbaum v. Commissioner, T.C. Memo. 1983-113: The fact finder must infer the individuals' intent in part from the objective evidence as to their actions, which may be ambiguous, and in part from their own testimony, which is almost by definition self-serving.
The "badges of fraud" used to infer fraudulent intent include the following: (1) Understating income; (2) maintaining inadequate records; (3) failing to file tax returns; (4) giving implausible or inconsistent explanations of behavior; (5) concealing assets; (6) failing to cooperate with tax authorities; (7) engaging in illegal activities; (8) attempting to conceal illegal activities; (9) *82 dealing in cash; and (10) failing to make estimated tax payments. Recklitis v. Commissioner, supra at 910 (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601); see Wheadon v. Commissioner, T.C. Memo. 1992-633. In addition, failure to report substantial amounts of income over a number of years has been used to show fraudulent intent. Vannaman v. Commissioner, 54 T.C. 1011 (1970). Evidence of prior or subsequent bad acts is also relevant to prove intent or state of mind where they appear to be part of a pattern. United States v. King, 768 F.2d 586, 587-588 (4th Cir. 1985); United States v. Hadaway, 681 F.2d 214, 217 (4th Cir. 1982). The list of the badges of fraud, however, is illustrative. We consider the totality of the facts and circumstances of each case to determine whether there is fraudulent intent. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992); Recklitis v. Commissioner, supra. *83 Respondent contends that the following facts, taken together, prove that petitioners had the specific intent to evade paying income tax on at least some part of the underpayments for the years in issue: (1) Their failures to file correct and timely income tax returns for the years 1981 through 1984; (2) their failures properly to report substantial amounts of rental income, capital gains, and interest; (3) their failures to maintain records of the rents received and proceeds of sale of the apartment; (4) their failures to pay income taxes for the years in question; (5) their failures to pay estimated taxes; (6) their convictions for tax evasion and fraud for prior years; (7) their cashing, rather than depositing, rent checks from the Library; and (8) their business experience. Respondent's counsel, in her opening statement, expressed the view that the stipulated facts were sufficient to prove fraud, [18] and that petitioners' "testimony may in fact bolster Respondent's case". Petitioners were the only witnesses in the case before us, and respondent called them to testify. Petitioners' testimony has left us with the conclusion that the evidence of fraud, considered in its totality, *84 is less than clear and convincing.
A good faith misunderstanding of the tax laws or good faith belief that one is not violating the law tends to negate the existence of fraudulent intent. See Niedringhaus v. Commissioner, 99 T.C.    ,     (1992) (slip op. at 24). For the taxable year 1981, Mr. Comparato did not realize that the payments from the Library were required to be reported as income for that year. Mr. Comparato erroneously thought the $ 9,000 security deposit and the $ 4,500 prepayment of the January 1982 rent were 1982 income, rather than income for 1981, the year they were received. [19] See secs. 1.446-1(c)(1)(i); 1.451-1(a), Income Tax Regs. This was a bona fide misunderstanding of the tax law. *85 Mr. Comparato did not file a return form for 1981. However, when he belatedly filed his tax return forms, he reported $ 42,000 as income on the 1982 form. This amount is $ 10,630.97 more than *86 the income that respondent agrees petitioners actually had for that year. Thus, Mr. Comparato attempted to report the 1981 rent deposit and advance payment as 1982 income, the year for which he thought they were reportable. Respondent has not shown, and we do not believe, that Mrs. Comparato understood any better than her husband that the prepayments received in 1981 were 1981 income rather than 1982 income. Moreover, Mrs. Comparato's testimony at trial and conduct with respect to the years 1974, 1975, and 1976 and the years in issue, indicate that she thought all the family income belonged to Mr. Comparato, and that if anyone was obligated to report it to the IRS, it was he. The combination of her lack of understanding how this income should have been reported and her notions about the roles and property relationships of husband and wife, leaves us unconvinced that she fraudulently failed to report the $ 13,500, or any part of it, as her income for 1981. Respondent has not shown by clear and convincing evidence that petitioners knew that they should have reported any rental income for 1981. As a result, we hold that neither petitioner acted fraudulently in failing to report *87 any part of the $ 13,500 rent and security deposits as income for the year 1981. With respect to 1982, 1983, and 1984, neither respondent nor petitioners provided a satisfactory explanation for petitioners' failures to file returns and pay taxes. It is difficult to understand how petitioners, after what had been a very unpleasant experience with the tax system for the prior years 1974-1976, could have believed that their failures to file returns and pay taxes for the later years in issue would escape respondent's notice. This is particularly so, in view of the criminal investigation, petitioners' criminal convictions, and Mr. Comparato's 3-month jail term in 1982, one of the tax years before us. Respondent points out that, during the years 1982-1984, both petitioners were on probation for their earlier tax offenses, but their probation was not revoked, nor were any criminal charges made against them for their failures to file returns and pay tax for these later years. There is no direct evidence in the record about whether and how petitioners satisfied their income tax obligations for the intervening years, 1977 through 1980. In an ostensible attempt to refresh Mr. Comparato's *88 memory and elicit testimony that he and Mrs. Comparato had not filed returns or paid tax for these intervening years, respondent's counsel referred at trial to the revenue agent's report in this case. [20] However, that report was only marked for identification and not admitted into evidence. Respondent has not presented any direct evidence regarding petitioners' income tax for the years 1977 through 1980. Respondent's failure to account for or explain what happened during this intervening period leaves us unconvinced by respondent's argument that petitioners' failures to file returns or pay tax from 1981 through 1984 were part of a lengthy period and pattern of fraud that began in 1974. *89 Petitioners' failures during the years before us reflect a pattern of inactivity different from the affirmative acts that petitioners were found to have engaged in during the earlier years for which they were convicted of tax fraud. It rather appears that petitioners' failures to satisfy their income tax obligations for the years in issue are attributable to reasons other than their intent to evade the payment of tax. Although the stipulated facts include items of evidence that tend to show fraud, petitioners' testimony supports alternative explanations for petitioners' failures to file returns and pay tax during the years at issue. As a result, we are not convinced that petitioners' failures to file returns and pay tax were induced by fraudulent intent to evade their income tax responsibilities. Petitioners were under severe strain during the years at issue. While petitioners' travails did not result in mental illness of the kind generally required to show lack of mental capacity for fraud, see Hollman v. Commissioner, 38 T.C. 251, 259-260 (1962), their experiences with Murray Hill's tax accountant (who they believed was responsible for their *90 plight in the earlier years) appear to have put them in such a state of mind that they were blocked from getting the professional tax advice they needed. Their experiences of their criminal investigations, indictments, trial, and convictions also appear to have blocked them from taking the actions they knew or should have known were necessary to comply with the tax law. It also appears that petitioners were burdened and distracted by the combined effects of their serious financial and tax problems stemming from the downfall of Murray Hill and the disability and sickness of their youngest son, who died in 1984 at age 19, after a long illness. These problems, singly or in combination, may well have contributed to petitioners' failures to take the steps needed to cope with their income tax obligations. If Mr. Comparato did say to a revenue agent or believe that he had not filed returns in order to "protect * * * [his] rights", as suggested by respondent's counsel, this might have reflected a notion that, having been convicted of tax crimes in connection with returns that had been filed, he would be safer in future if he just did nothing. Although the advice of a competent tax professional *91 would have disabused him of this notion, Mr. Comparato appears to have been blocked from obtaining such advice. We are not satisfied that such a statement or belief by Mr. Comparato, arrived at without competent tax advice, is an indication of fraudulent intent in the circumstances of this case. Our impression of this situation is rather like our reactions to the situations of the taxpayers in Hudgens v. Commissioner, T.C. Memo. 1985-587, and Paddock v. Commissioner, T.C. Memo. 1985-586. The taxpayers there had been convicted under section 7203 of willful failure to file income tax returns for the years in issue, but we rejected respondent's determinations of fraud. As in Paddock and Hudgens, there appears to have been an emotional element that contributed to petitioners' "inability to confront [their] situation in any constructive way", and "to take any steps to confront this continuing default on [their] tax obligations". Hudgens v. Commissioner, supra.
Petitioners testified that a reason for Murray Hill's downfall was that employees of the IRS told Murray Hill's customers *92 not to continue dealing with it. However, such anger and resentment as petitioners displayed during their testimony was directed at their former accountant, rather than the IRS or any of its employees. This is not a case like Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958), in which the trial court's finding that the fraud addition should be imposed was upheld on the ground that the taxpayer had not filed returns for 9 successive years because he thought the Government was wasting the money and because he had adopted a belligerent and noncooperative attitude toward the auditing agents. Although petitioners' failures to do the necessary were unreasonable, and might even have been "willful" within the meaning of section 7203 or "intentional" within the meaning of section 6653, cf. Hudgens v. Commissioner, supra, and Paddock v. Commissioner, supra, the evidence introduced by respondent has not convinced us that petitioners had the requisite fraudulent intent. Neither negligence, no matter how egregious, nor willfulness, without more, amounts to fraud. Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941); *93 Hudgens v. Commissioner, supra, Paddock v. Commissioner, supra.We require clear and convincing evidence of fraudulent intent. This respondent has not shown. The totality of the evidence, rather than being clear and convincing, is unclear and equivocal. In order for us to reject respondent's determinations of fraud in this case, it is not necessary for us to conclude that petitioners' explanations of their inaction were truthful in all respects. See Rinehart v. Commissioner, T.C. Memo. 1983-184. What we have found, observing petitioners' demeanor and hearing their testimony, and reviewing the record as a whole, is that their testimony created sufficient doubts about the significance of the stipulated and documentary evidence as to render it less than clear and convincing as evidence of fraud. Petitioners' principal source of income in 1982 and 1983, with the exception of some unknown amount of wages earned by Mr. Comparato as a dispatcher, [21] was their rental income, which they received from the Library in the form of checks that Mrs. Comparato cashed rather than deposited *94 in a bank account. Although cashing checks, combined with a failure to report income, is sometimes cited as an indication of fraud because it suggests deception, see, e.g., Morris v. Commissioner, T.C. Memo. 1992-635, we bear in mind that the cooperative apartment rental was the primary source of petitioners' income in the years 1982 and 1983 until they sold the apartment in 1984. Respondent argues that petitioners' failure to keep records is further *95 evidence of their fraud. A failure to maintain adequate books and records suggests that the taxpayer is trying to hide his income and is often cited as one of the badges of fraud. See, e.g., Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. However, recordkeeping not only aids the Government in detecting income; it also aids the taxpayer in substantiating deductions and other tax benefits. By failing to keep records of various expenditures, petitioners have denied themselves the benefit of substantial deductions for medical expenses and interest, as well as increases in basis and depreciation deductions attributable to the improvements to the apartment. [22]
*96 We do not believe that petitioners' failure to maintain adequate books and records of the apartment rents was designed to thwart the collection of tax. Petitioners leased the apartment to the president of the New York Public Library, which paid them each month by check. A substantial portion of the evidence consists of copies of the Library's check stubs. The record also contains documentary evidence of the sale of petitioners' cooperative shares in 1984. All of the income with which respondent charges petitioners is substantiated by documentary proof except for the interest income, to which petitioners stipulated. We do not condone petitioners' failure to maintain adequate books and records and report their income as required by law. However, the proof offered by respondent leaves us with the impression that these failures were due to negligence, rather than fraud. See Clark v. Commissioner, T.C. Memo. 1988-67. We are not convinced, in the circumstances of this case, that Mr. Comparato's belated flurry of filing incomplete tax return forms, more than a year after commencement of the audit, tends to show fraud. Although these forms did not *97 rise to the level of completeness required by section 6011, see White v. Commissioner, 72 T.C. 1126, 1129-1130 (1979), it appears that Mr. Comparato filed them, after the audit was well underway, in the hope and expectation that respondent would calculate his tax liabilities for him, and in so doing, allow deductions for costs and expenses that he was unable to substantiate because of his failure to keep records. [23]
*98 Contrary to respondent's assertion, Mr. Comparato's overreporting of income on some of these forms does not indicate fraudulent intent. Mr. Comparato made an attempt to include the 1981 income on the 1982 form because that was the year in which he though it was taxable. Mr. Comparato also reported income of $ 550,000 on the 1985 return form. This amount represents the gross proceeds of sale of the cooperative shares; it is $ 343,200 more than the stipulated aggregate net gain on the transaction, after taking account of the section 1202 deduction. [24] Mr. Comparato's failure to report the amount of gain on the return form for the correct year appears to be another instance of negligence. [25]
*99 We have not treated Mr. Comparato's belated filing of tax return forms as curative; later repentant behavior does not absolve a taxpayer of his antecedent fraud. Badaracco v. Commissioner, 464 U.S. 386, 394 (1984); Niedringhaus v. Commissioner, 99 T.C. at     (slip op. at 17). However, we are not convinced that petitioners had committed any "antecedent fraud" with respect to the years in issue. [26]
*100 There is no evidence in the record of when and how the audit or audits of petitioners' tax liabilities commenced or were conducted for years after 1976. There is no evidence that petitioners did not try to cooperate with the IRS during the audit or audits. It does appear that an audit had been going on for almost 2 years when Mr. Comparato, in March 1986, finally filed the return forms for the years 1982 through 1985. [27] Despite intimations of respondent's counsel during the trial that petitioners' failure to file returns for later years had violated the terms of their probation in their prior criminal case, there is no indication that respondent tried to have petitioners' probation revoked, or considered or sought criminal charges against them for any taxable years following 1976. *101 Finally, there is a separate ground for exonerating Mrs. Comparato from the fraud addition for each of the years in issue before the Court. Mrs. Comparato did not file Federal income tax returns for any of petitioners' taxable years that have been considered by this Court (1974-1976 and 1981-1984). The tax deficiencies for which she had previously been held liable (1974-1976) were based upon deemed admissions under Tax Court Rules 90(g) and 91(f). Those were also years for which Mr. Comparato had filed separate returns that purported to include the entire family income. For the years before us, the tax deficiencies to which Mrs. Comparato has agreed are based on the conclusion that the taxable income for each of these years is attributable one-half to Mr. Comparato and one-half to Mrs. Comparato. Nevertheless, Mrs. Comparato testified at trial that she thought all the family income was her husband's and that it belonged or was attributable to him as head of the household. Mrs. Comparato testified that the arrangements for her to enter into the lease and to have the rent checks made out in her name were at the direction of Mr. Comparato and as a matter of convenience in connection *102 with his impending incarceration. She gave no specific explanation -- nor was she asked -- why title to the cooperative shares was changed to the joint names or tenancy in common. It nevertheless appears from petitioners' testimony that Mr. Comparato exercised dominion and control over the rent payments and the proceeds of the sale of the cooperative shares and their disposition. This evidence casts sufficient independent doubt on respondent's determinations of Mrs. Comparato's fraudulent intent as to render them less than clear and convincing. Cf. Cirillo v. Commissioner, T.C. Memo. 1961-192, revd. in part on another issue 314 F.2d 478 (3d Cir. 1963). On the basis of our impressions of petitioners and their testimony, and a review of the entire record, we conclude that respondent has failed to show by clear and convincing evidence that petitioners had the specific intent to evade taxes they knew to be owing, or that they engaged in conduct intended to conceal or mislead or otherwise prevent the collection of any tax. We therefore reject respondent's determinations of additions to tax for fraud for all taxable years in *103 issue. Issue 2. Failure to File and Negligence
Section 6653(b)(3) and (d) provides that the Commissioner, having determined that a taxpayer is liable for the addition to tax for fraud, is not entitled to determine that the taxpayer is concurrently liable for additions to tax for negligence and failing to file a return or pay tax. However, respondent may determine these additions in the statutory notice as alternatives to the addition for fraud, and if we find that respondent does not prove the taxpayer guilty of fraud by clear and convincing evidence, the taxpayer then bears the burden of proving by a preponderance of the evidence that he or she is not liable for the alternative additions to tax. Rule 142. Petitioners' 2-page brief only addressed the fraud additions. Although we do not thereby deem petitioners to have conceded the alternative additions, based on negligence and failure to file returns, the facts are such that these matters can be resolved by recourse to a more summary analysis than that required adequately to address the fraud issues. For these matters, on which petitioners have the burden of proof, we accept and rely upon petitioners' stipulation that *104 one-half the taxable income of each year is attributed to each of them. Petitioners testified that they held traditional old-world beliefs regarding the roles of husband and wife, and that they believed that Mr. Comparato, as the head of the household, was in charge of all business and tax matters. [28] Although these traditional attitudes may have played a part in Mrs. Comparato's failure to perform her income tax obligations during the years in question, cf. Grosso v. Commissioner, T.C. Memo. 1980-186, affd. without published opinion 676 F.2d 685 (3d Cir. 1982); Estate of Aquilino v. Commissioner, T.C. Memo. 1972-185, so as to exonerate her from the fraud addition, as to which respondent has a heavy burden of proof, they do not provide an excuse for negligence, on which petitioners have the burden of proof by a preponderance of the evidence. *105 A. Failure to File
Section 6651(a)(1) imposes a 5-percent addition to tax for the failure to file an income tax return. The amount increases by 5 percent for each month that the return is not filed, not in excess of 25 percent in the aggregate. This addition to tax will not be imposed if the failure to file was "due to reasonable cause and not due to willful neglect." Sec. 6651(a)(1). Petitioners bear the burden of proving that they acted reasonably and prudently. Rule 142; Shomaker v. Commissioner, 38 T.C. 192, 202 (1962). Mr. Comparato did not file income tax return forms for any of the years in issue until March 10, 1986, when he used Forms 1040A to file return forms for the years 1982 through 1985. Mrs. Comparato did not try to file any returns for any of the years in question. Mr. Comparato's mistake of law that he did not realize that the $ 13,500 advance payment received in late 1981 was 1981 income does not excuse him from filing an income tax return. His belief that he was not required to file a tax return was not bolstered by advice from competent tax counsel who had been informed of relevant facts, and does not constitute reasonable *106 cause under section 6651(a)(1). Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 133 (1962), affd. in part and revd. in part on other grounds 324 F.2d 633 (8th Cir. 1963); Vinz v. Commissioner, T.C. Memo. 1984-84. Nor has Mr. Comparato advanced evidence that he acted reasonably and prudently under the circumstances in not filing timely returns for the later years. See Myers v. Commissioner, T.C. Memo. 1980-437. Mrs. Comparato has not shown that her failure to file returns for the years in question was due to reasonable cause and not willful neglect, and she also is liable for additions to tax under section 6651(a)(1) for those years. Rule 142; Shomaker v. Commissioner, supra. Mrs. Comparato is not excused from the additions for failure to file on the ground that she thought filing tax returns was her husband's job inasmuch as all the family income was attributable to him as "man of the house" or because she relied on her husband to prepare and file their joint returns. United States v. Boyle, 469 U.S. 241 (1985) *107 (reliance on an attorney to timely file an estate tax return did not constitute reasonable cause); Belk v. Commissioner, 93 T.C. 434, 447 (1989); see Lucia v. Commissioner, T.C. Memo. 1991-77. We therefore hold that petitioners are liable for additions to tax under section 6651(a)(1) for failing to timely file returns for all years in question. B. Negligence
Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment due to negligence or intentional disregard of rules or regulations. Pursuant to this section, if any part of the underpayment was due to negligence or intentional disregard of rules or regulations, the 5-percent addition to tax is imposed on the entire underpayment. Section 6653(a)(2) imposes an addition of 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence has been defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), *108 affg. T.C. Memo. 1964-303; Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence is measured by an objective standard, Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531, and courts do not look into the taxpayer's mind when deciding whether he or she acted reasonably or prudently. Instead, they look to what a reasonably prudent person would have done in the circumstances. Id. Petitioners bear the burden of proving that they were not negligent and that they did not intentionally disregard rules and regulations. Rule 142; Enoch v. Commissioner, 57 T.C. 781, 802 (1972). The evidence supports the conclusions that petitioners acted negligently in failing to fulfill their duties to file Federal income tax returns, pay tax, and keep records for the years in question. Petitioners have not met their burden of proving that they acted reasonably or prudently with respect to their income tax obligations for those years. We therefore hold that petitioners are liable for additions to tax under section *109 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations for all years in question. Issue 3. Failure to Pay Estimated Tax
Regardless of whether the addition to tax for fraud is determined, respondent may determine additions to tax under section 6654 for failing to make timely and sufficient payments of estimated tax. This addition is calculated by applying the underpayment interest rate established under section 6621 to the amount of the underpayment for the period of the underpayment. Section 6654(b) defined an "underpayment" as the excess of (1) The amount of the installment which would be required to be paid if the estimated tax were equal to 80 percent * * * of the tax shown on the return for the taxable year or, if no return was filed, 80 percent * * * of the tax for such year, over (2) The amount, if any, of the installment paid on or before the last date prescribed for such payment.
Petitioners have not satisfied the statutory exceptions provided in section 6654(d) and, for the years at issue, there is no exception for reasonable cause or lack of willful neglect; the addition is mandatory. Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). *110 Inasmuch as petitioners did not make any estimated tax payments, they are liable for additions to tax under section 6654 for all the years at issue. [29]
Conclusion
In light of the parties' stipulations and concessions and our various holdings on the additions to tax, recomputations of the deficiencies and additions to tax are required for all the years at issue. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. For the year 1981, this section was designated sec. 6653(b).↩
2. 50 percent of the interest due on the portion of the underpayment attributable to fraud.↩
1. For the year 1981, this section was designated sec. 6653(b).↩
2. 50 percent of the interest due on the portion of the underpayment attributable to fraud.↩
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. These reduced amounts are substantially exceeded by jeopardy assessments that respondent made on August 23, 1989, against petitioners for the years in question. These assessments equaled or exceeded the amounts of the deficiencies and additions originally determined by respondent, and also included substantial amounts of interest on the original deficiencies to the assessment date. At trial, respondent's counsel stated that none of the assessed amounts had been collected from petitioners.↩
3. Comparato v. Commissioner, T.C. Memo. 1989-634↩.
4. Petitioners signed short stipulations of fact that only recited such facts as their address, the date the notices of deficiency were mailed, that Murray Hill was a corporation, etc.↩
5. On August 23, 1989, respondent had made jeopardy assessments for the determined deficiencies in Federal income tax, and the fraud addition, plus interest against petitioners for the years 1974, 1975, and 1976. These assessments were made simultaneously with the jeopardy assessments in the case at hand. See supra↩ note 2.
6. Comparato v. Commissioner, T.C. Memo. 1989-634↩.
7. Both attorneys are sole practitioners with their offices in Denver, Colorado.↩
8. The contract of sale shows "Anthony J. Comparatto" [sic] as the sole purchaser of the shares.↩
9. On Aug. 17, 1983, petitioners received a check for $ 2,738.97, which equaled $ 3,214.59 plus $ 141.39 for electricity paid by petitioners, less $ 617.01 for 3 months of assessments paid by the Library. The electricity was Dr. Gregorian's responsibility and the assessments were petitioners' responsibility.↩
10. Although petitioners did not keep records of the rental payments received, respondent was able to determine their rental income from the Library's records. Inasmuch as maintenance payments to the cooperative have been allowed as deductions in computing petitioners' taxable incomes for 1982 and 1983, the question of whether petitioners should have been allowed deductions under sec. 216 of pass-through taxes and interest on the cooperative maintenance payments does not arise. However, respondent has not agreed to any deduction for depreciation under secs. 216(c) and 167.↩
11. The contract of sale shows "Anthony Comparato and Mildred Comparato" as the sellers of the shares. There is no explanation in the record of the differences between the contracts of purchase and sale of the cooperative shares, or of the circumstances in which both Mr. and Mrs. Comparato acquired interests in the shares. See supra↩ note 8.
12. The statutory notices of deficiency determined that the cooperative shares had a useful life of 30 years and reduced petitioners' $ 30,000 cost basis in those shares by $ 1,000 for 2 years to account for depreciation allowed or allowable. See sec. 1016(a)(2). As a result, respondent determined petitioners' basis to be $ 28,000 and computed their gain accordingly. However, the parties have stipulated that petitioners' basis in the cooperative shares was $ 30,000 rather than $ 28,000.↩
13. SEC. 1202. DEDUCTION FOR CAPITAL GAINS (a) In General. -- If for any taxable year a taxpayer other than a corporation has a net capital gain, 60 percent of the amount of the net capital gain shall be a deduction from gross income.↩
14. In computing Mr. Comparato's deficiencies for 1982-1984, respondent did not specifically indicate that Mr. Comparato was allowed a personal exemption under sec. 151. However, it appears that respondent reduced his taxable income by $ 1,000 for each of those years, the amount of the exemption. In the Rule 155 computations, the parties should make clear that petitioners are each being allowed the personal exemption.↩
15. The forms filed by Mr. Comparato showed gross income in the following amounts for the years 1982 through 1985: ↩
Year
Description
Income Reported
1982
Various
$ 42,000 1983
Various
35,750
1984
Various
9,975
1985
Various
2,100
"Plus"
550,000
16. Marked for identification as respondent's exhibit GG, but not admitted into evidence.↩
17. See Balter, Tax Fraud and Evasion, par. 8.03[9][a], at 8-71 (1983 & 1992 Supp.).↩
18. In so saying, respondent's counsel no doubt had in mind our decision in Comparato v. Commissioner, T.C. Memo. 1989-634, in which we sustained, without a trial, respondent's determinations of fraud on the basis of facts deemed admitted under Rules 90(g) and 91(f)↩.
19. On direct examination by respondent's counsel, Mr. Comparato testified as follows: Q. Okay. And after you left prison in 1982, could you tell the Court why you didn't file tax returns for 1981 that hadn't been filed up until that point? A. I don't know why I didn't file. I didn't think I had to. [Tr. at 15.] * * * On cross examination, Mr. Comparato testified as follows: Q. And why didn't you file a return for 1981? You filed one for '82, '83, '84, and '85. Why didn't you file for 1981? A. Well, because the deposit was for '82. It wasn't for 1981. And the month's rent was for 1982. It wasn't for '81. So I didn't feel I had any income for 1981. [Tr. at 24.] * * * Q. Mr. Comparato, do you know what a cash basis taxpayer is as opposed to an accrual basis taxpayer? A. No, sir, I don't. [Tr. at 26.]↩
20. Referring to the revenue agent's report, respondent's counsel asked Mr. Comparato the following question on direct examination: Q. * * * Do you recall telling any agent of the IRS [around 1984] that you had not filed your returns for the years '77 through '84 in order to protect your rights?
* * * Respondent's counsel then showed Mr. Comparato a revenue agent's report that was marked for identification but not admitted into evidence. Q. Now that you've read that [revenue agent's report], does it refresh your recollection at all so that you recall telling an agent of the IRS that you had not filed your returns in order to protect your rights? A. No, I don't remember. [Tr. at 18-20.]↩
21. Although Mr. Comparato testified that he worked as a dispatcher for some period during the years at issue, we have not found as a fact that Mr. Comparato had wage income because the record does not reveal the amount of such income and respondent did not determine that petitioners failed to report such income in her notices of deficiency. Respondent computed petitioners' deficiencies and additions to tax based only on rental income, capital gains, and bank interest, not wages. There is no Form W-2 in the record reporting any wage income.↩
22. Had petitioners not so readily stipulated to the deficiencies in these cases, we might have applied the Cohan rule and allowed them deductions and a basis increase for some part of these expenses. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930); see Joyce v. Commissioner, 25 T.C. 13 (1955); Roberts v. Commissioner, T.C. Memo. 1986-11↩.
23. On direct examination by respondent's counsel, Mr. Comparato testified as follows: Q. Did you consider using the money [from the sale of your apartment] to hire an accountant to prepare the tax returns that were past due? A. Ma'am, an accountant was the reason I went to jail the first time, and I wasn't going to hire any accountant to do any of my work. That's why, when I filed, I left it to the IRS to do my work for me. [Tr. at 17.]
* * * Q. What prompted you to file these returns in 1986? A. I was trying to find bills that we had improved the apartment like putting in a whole new kitchen, appliances, we put all new windows, we restored a bathroom completely. They'll be using it for a laundry room. And I could never come up with the bills, so I figured I might as well file and let the IRS take care of the rest of it because they have more at their disposal to find things out than I do. I did not have the record of the checks that we got, so I filed it and let the IRS take care of it. [Tr. at 21-22.]↩
24. See supra↩ note 13.
25. Certain individuals may elect not to show the amount of tax due on their return and the IRS will compute the tax. This option is restricted by specific income and deduction limitations. Petitioners were not eligible for this election because of their rental income and capital gains. Sec. 6014; sec. 1.6014-2, Income Tax Regs↩; see IRS Publication 17, "Your Federal Income Tax", for the years 1981-84.
26. This case is distinguishable from Niedringhaus v. Commissioner, 99 T.C.    ,  §?  (1992) (slip op. at 17). There a tax protester, who failed to file timely returns, filed some returns after the Commissioner began a criminal investigation. Petitioners are not tax protesters. Moreover, in Niedringhaus↩, we found the taxpayer's post-investigation filing to be an indication that he had known all along that he was required to file, in the face of his assertions, which the trier of fact did not credit, that he had believed in good faith that the tax laws did not properly apply to him.
27. During her direct examination of Mr. Comparato, Ms. Dever Camacho stated that, "This is, just for the record so that it's clear, this is the third page of Respondent's Exhibit GG [revenue agent's report], and the date on it starts at June 25th, 1984 and it goes to 7/31 of '84. [Tr. at 21.]↩
28. Respondent's direct-examination of Mr. Comparato included the following: Q How about, what was Mrs. Comparato's role in all this? A Mrs. Comparato is my wife, mother of my children, takes care of the house. And that's her role in this. I'm the head of the household. I make all the decisions. Q Why did you file with all the income in your name? A Because I'm the head of the household. I'm the man of the house. In an Italian household, the man is the man. There is no sharing responsibility. I'm the one. I take care of everything. [Tr. at 33.]↩
29. Sec. 6654 was substantially amended by sec. 411 of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, 788, and now allows the Commissioner, under sec. 6654(e)(3), to waive the addition "by reason of casualty, disaster, or other unusual circumstances [where] the imposition of such addition to tax would be against equity and good conscience." However, this amendment does not apply to the years at issue. DEFRA sec. 414(a)(2), 98 Stat. 793.↩